No. 14-56895

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

CHRISTINE MYERS, as Guardian Ad Litem
for L. M., a minor, individually,

*Plaintiff-Appellant*,

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee.*
_____

On appeal from the United States District Court for the
Southern District of California, San Diego, No. 3:02-cv-01349-BEN-MDD
Honorable Roger T. Benitez, District Judge
_____

**PLAINTIFF-APPELLANT'S OPENING BRIEF**
_____

Stephen T. Cox (SBN 39040)
 *scox@bzbm.com*
**BARTKO, ZANKEL, BUNZEL &
MILLER**
A Professional Law Corporation
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Telephone: (415) 956-1900
Facsimile: (415) 956-1152

Scott J. Allen (SBN 178925)
 *scott@sjallenlaw.com*
**LAW OFFICES OF SCOTT J.
ALLEN**
25 Glen Lake Drive
Pacific Grove, California 93950
Telephone: (831) 901-3901

*Attorneys for Plaintiff/Appellant*
*CHRISTINE MYERS, as Guardian Ad Litem for L. M., a minor, individually*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

STATEMENT OF JURISDICTION..........................................................4

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................................5

STATEMENT OF THE CASE AND FACTS .......................................................7

    A.   Summary Of This Court's Decision In *Myers One*....................................7

    B.   Judge Benitez's Biased Remarks Post-Reversal .........................................8

        1.   Anger At Ninth Circuit Surfaces At Spread The Mandate Hearing ...........................................................................9

            a.   Misstatements As To Case Languishing In Ninth Circuit ............9

            b.   Misstatements As To Workload ..................................................10

            c.   Judge Benitez's Hostility To This Court's Opinion And Reversal .......................................................................12

        2.   Judge Benitez Summarily Rejects Lacie's Request To Recuse Him .......................................................................14

        3.   Impartiality And Bias Manifested At The September 24, 2014 Status Conference ....................................................15

            a.   Unfounded Denigrating Remarks About the Integrity Of Counsel And The Myers Family ..................................16

            b.   The False Accusations That Plaintiff's Counsel Mislead This Court ......................................................................17

            c.   Claim Of Impugning Judge Benitez.............................................21

            d.   Judge Benitez's Determination That Counsel Was Without Integrity ........................................................................22

C.   Plaintiff's Counsel Did Not Poison The Well With The Expert Witnesses ...................................................................................23

     1.   Dr. Renfroe's Opinion Was Not "Corrupted" ....................................26

     2.   Counsel Did Not "Bias" Dr. Yarborough ............................................29

     3.   Dr. Michelle Dern's Opinion Was Not "Manipulated By Counsel" ..................................................................................31

     4.   Counsel Did Not Poison The Opinion Of Dr. Eichenfield.................31

     5.   Dr. Sandra Brown ...............................................................................36

ARGUMENT ....................................................................................................37

A.   Judge Benitez Committed Reversible Error By Failing To Recuse Himself Under 28 U.S.C. § 455 ...............................................37

B.   Judge Benitez's Refusal To Follow The Rule Of Mandate Results Is Reversible Error ........................................................41

C.   It Was Reversible Error To Deny Plaintiff's Motion To Shift The Burden Of Proof ............................................................46

D.   This Court Should Determine The Issue Of Causation And Remand The Case To A New Judge To Decide Damages On The Basis Of The Record And Further Briefing ...........................................51

     1.   This Court Can Make Findings That The Government's Negligence Proximately Caused Lacie's Injuries .............................51

         a.   Gastrointestinal Symptom ...........................................51

         b.   Peripheral Neuropathy ..................................................52

         c.   Lacie Had Elevated LDH Levels In Her Blood ...........................53

         d.   The Published Literature And The Parties' Experts Agree That Increased LDH Levels Are An Indicator Of Thallium Toxicity ..................................................................54

     2.   There Is No Association Between Elevated LDH And Autoimmune Alopecia ........................................................................56

3. This Court Should Remand The Case To A New District Court Judge To Determine Causation, If It Does Not Do So, And To Make A Determination Of Lacie's Damages Based On The Extensive Record ................................................................................. 57

CONCLUSION ....................................................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. United States*
 588 F. Supp. 247 (D. Utah 1984).........................................................49

*Baldwin Hardware Corp. v. Franksu Enter. Corp.*
 78 F.3d 550 (Fed. Cir. 1996) ......................................................39, 40

*Clemens v. U.S. Dist. Court for Cent. Dist. of Cal.*
 428 F.3d 1175 (9th Cir. 2005) ............................................................39

*Cummings v. Kendall*
 41 Cal. App. 2d 549 (1940) ................................................................48

*Dickerson, Inc. v. Holloway*
 685 F. Supp. 1555 (S.D. Fla. 1987)....................................................49

*Fiberboard Paper Products Corp. v. E. Bay Union of Machinists*
 227 Cal. App. 2d 675 (1964) ..............................................................48

*First Interstate Bank of Ariz., N.A. v. Murphy, Weir & Butler*
 210 F.3d 983 (9th Cir. 2000) ..............................................................38

*Fresh Meadow Food Servs., LLC v. RB 175 Corp.*
 502 F.App'x 81, 82 (2d Cir. 2012) .....................................................59

*Galanek v. Wismar*
 68 Cal. App. 4th 1417 (1999) .............................................................50

*Goodman v. Staples The Office Superstore, LLC*
 644 F.3d 817 (9th Cir. 2011) ........................................................passim

*Haft v. Lone Palm Hotel*
 3 Cal. 3d 756 (1970) ....................................................................passim

*Harris v. Irish Truck Lines, Inc.*
 11 Cal. 3d 373 (1974) .........................................................................48

*In re Bernard*
 31 F.3d 842 (9th Cir. 1994) ..................................................................9

*In re Marshall*
    721 F.3d 1032 (9th Cir. 2013) ..............................................................39

*In re Mason*
    916 F.2d 384 (7th Cir. 1990) ................................................................39

*In re Mendoza*
    182 F.App'x 661 (9th Cir. 2006) remanded .........................................59

*In re Sanford Fork & Tool Co.*
    160 U.S. 247 (1895)..............................................................................41

*LaSalle Extension University v. FTC*
    627 F.2d 481 (D.C. Cir. 1980)..............................................................58

*Liteky v. United States*
    510 U.S. 540 (1994).......................................................................39, 60

*McCord v. Bailey*
    636 F.2d 606 (D.C. Cir. 1980)..............................................................58

*Milton v. Weinberger*
    645 F.2d 1070 (D.C. Cir. 1981)............................................................58

*Myers v. United States*
    652 F.3d 1021 (9th Cir. 2011) ......................................................*passim*

*Noli v. CIR*
    860 F.2d 1521 (9th Cir. 1988) ..............................................................38

*Rosen v. Sugarman*
    357 F.2d 794 (2d Cir. 1966) .................................................................40

*Sanderson v. International Flavors and Fragrances, Inc.*
    950 F. Supp. 981 (C.D. Cal. 1996) .......................................................50

*Stuart v. Local 727, Int'l. Bhd. of Teamsters*
    771 F.3d 1014 (7th Cir. 2014) ..............................................................15

*Summers v Tice*
    33 Cal. 2d 80 (1948) ......................................................................47, 48

*Terran v. Kaplan*
    109 F.3d 1428 (9th Cir. 1997) ...................................................................41, 46

*United States v. Berberian*
    851 F.2d 236 (9th Cir. 1988) ...................................................................40, 41

*United States v. Burt*
    765 F.2d 1364 (9th Cir. 1985) ..................................................................40

*United States v. Gardenhire*
    784 F.3d 1277 (9th Cir. 2015) ..................................................................60

*United States v. Grinnell Corp.*
    384 U.S. 563 (1966).................................................................................39

*United States v. Holland*
    519 F.3d 909 (9th Cir. 2008) ...................................................................37

*United States v. Kennedy*
    682 F.3d 244 (3d Cir. 2012) ....................................................................40

*United States v. Likens*
    487 F. Supp. 2d 1046 (S.D. Iowa 2007.) .................................................41

*United States v. Sibla*
    624 F.2d 864 (9th Cir. 1980) ............................................................37, 38, 39

*United States v. Thrasher*
    483 F.3d 977 (9th Cir. 2007) ...................................................................41

*United States v. Wilkerson*
    208 F.3d 794 (9th Cir. 2000) ...................................................................40

*Ybarra v Spangard*
    25 Cal. 2d 486 (1944) ..........................................................................47, 48

**Statutes**

28 United States Code

 § 144................................................................................................38
 § 455..........................................................................................37, 38
 § 1291...............................................................................................4
 § 1332...............................................................................................5
 § 2106.........................................................................................8, 60

**Other Authorities**

Code of Conduct for United States Judges Canon 2A (2014) ....................................3

Federal Rules of Civil Procedure
 Rule 26...........................................................................................35
 Rule 26(a)(2)(B)...............................................................................29

http://www.ca9.uscourts.gov/media/view.php?pk_id=0000005678 .......................21

http://www.uscourts.gov/statistics/table/na/ federal-court-
 management-statistics/2014/12/31-2 ................................................................12

## INTRODUCTION AND SUMMARY OF ARGUMENT

Appellant recognizes that challenges based on bias and lack of impartiality are rare and are only granted in exceptional cases. This is one of those cases as this Court will see from the record of what transpired after it reversed the trial court's first decision. This appeal was made necessary because of the extreme and pervasive judicial bias exhibited by the Hon. District Judge Roger T. Benitez, the trial judge, subsequent to the reversal of his decision in Phase I of this case. In hearings and his second decision after the reversal of his first decision, Judge Benitez demonstrated extreme bias toward Plaintiff, Lacie Myers ("Lacie"), her counsel, and made degrading remarks about this Court and its decision. His post-reversal, openly prejudicial comments reflected a state of mind that effectively deprived Lacie—a young girl injured from thallium exposure when she was 3 years old—of an impartial determination of her claim. Because of Judge Benitez's strongly expressed hostility to this Court and denigration of and refusal to follow the Court's opinion, Judge Benitez should have recused himself. His refusal to do so is that extremely rare case constituting reversible error. Reversal is not only necessary because of his lack of impartiality and denial of a fair hearing for Lacie, but to preserve the appearance of justice and to maintain public confidence in the federal judiciary.

Because this case has now been tried twice and been pending almost 13 years, a third trial, based on repeated errors by the same judge would be unduly expensive and wasteful. In its prior decision in this case, this Court was able to make its own findings due to the clearly erroneous findings made by the District Court. It can do so again based on the clear error committed by the District Court without the need for a retrial on causation.

The district court failed to shift the burden of proof on the issue of causation to the government due to the government failing to properly monitor the dust coming off the landfill, failed to shift the burden of proof due to the government failing to preserve medical records of Lacie pertaining to her visit with Dr. Lennard when she went into see him for gastrointestinal symptoms in December 1999, when her hair was starting to fall out, failed to follow this Court's mandate as to there being elevated levels of thallium in the dirt and ash being dumped next to Lacie's house, and failed to follow the mandate as to Lacie having elevated levels of thallium in her urine.

In addition, the district court improperly gave little or no weight to the opinions of Lacie's treating doctors and retained neuropsychologist due to a misapplication of *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817 (9th Cir. 2011). Each of these doctors' opinions, arrived at when treating Lacie,

was that she was suffering from thallium toxicity, with its classic symptoms of hair loss, peripheral neuropathy, and compromised cognitive function.

With these errors corrected, it is established, there was thallium in the dirt, thallium in Lacie, with the classic symptoms of thallium toxicity. As a result, this Court can and should direct a judgment on the issue of causation. As to damages, the evidence was adduced at Phase II, and is in the record. It will not be necessary then to have a trial on damages with live witnesses, as the damage issues can be decided by a new judge based on the record. Accordingly, this Court must reverse and remand for a brief trial on damages before a different judge.

In deciding this matter, this Court should be guided by the Code of Conduct for United States Judges, which provides in part:

> An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges.

Code of Conduct for United States Judges Canon 2A (2014).

Judge Benitez's bias and his inability to put out of mind his first decision are pervasive: (1) His denigrating and derisive statements towards this Court and Lacie's counsel in his decision and during post-reversal hearings, stating

-3-

at one hearing to counsel that he could not "trust a word you say, not a word"[1];

(2) his refusal to comply with this Court's mandate in the Phase 2 trial; (3) his

across-the-board flat-out rejection of Lacie's experts and treating physicians based

on his unfounded view that Plaintiff's counsel "poisoned the well"; and (4) his

failure to shift the burden of proof to the Government when it was the

Government's negligence in failing to have proper air monitoring that made it

impossible for plaintiff to prove the necessary causation with certainty. These

factors collectively and individually establish that any reasonable person would

conclude that Judge Benitez was biased and would not be impartial. They also

establish reversible error which must result in a determination that the

Government's negligence, as previously determined by this Court, was the

proximate cause of Lacie's injuries. The only issue to be determined on remand

(to a different judge) is the amount of damages, which can easily be determined on

the basis of the record before the Court and, if the trial judge orders it, further

briefing.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal pursuant to 28 U.S.C.

§ 1291. The United States District Court for the Southern District of California (the

"District Court") had subject matter jurisdiction over this action pursuant to

---

[1] 1 ER0025:8-9.

-4-

28 U.S.C. § 1332. After filing an administrative claim with the Navy, Plaintiff filed suit on July 10, 2002. 3 ER0335-351. Between February 28 and March 10, 2006, the parties tried the first phase (Phase 1) of a bifurcated bench trial before Judge Benitez. On May 15, 2009, Judge Benitez rendered a 12-page decision rejecting the Plaintiff's claim. 2 ER0271-283.

Plaintiff filed a notice of appeal of Judge Benitez's Phase 1 decision on July 14, 2009. 2 ER0268-269. After briefing and argument, this Court issued its opinion reversing Judge Benitez's Phase 1 decision on July 15, 2011. This Court's mandate was issued on October 12, 2011 and the district court issued a "Notice of Spreading the Mandate" on October 13, 2011. 2 ER0265; 4 ER0653 .

The parties tried the second phase ("Phase 2") of the bifurcated case before Judge Benitez, from February 19 through March 8, 2013. On November 20, 2014, Judge Benitez rendered his Phase 2 decision—120 pages in length—rejecting the Plaintiff's claims once again and entering final judgment for Defendant. 2 ER0036-155. Plaintiff filed a timely notice of appeal to this Court on December 3, 2014. 1 ER0001-2.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Did the Honorable District Court Judge Roger T. Benitez erroneously fail to recuse himself on remand of this case because of his lack of impartiality and bias: 1) reflected by his inability to put out of his mind his

-5-

findings in his previous decision after this court reversed that decision in *Myers v. United States*, 652 F.3d 1021 (9th Cir. 2011) (hereinafter "*Myers One*"); 2) his open hostility towards this Court which he took out on Lacie and her counsel; 3) failure to follow the mandate in *Myers One*; 4) disregard of the opinions of plaintiff's experts and treating physicians; and 5) refusal to shift the burden of proof on causation thereby failing to maintain the appearance of justice?

2.    Did the Honorable District Court Judge Roger T. Benitez fail to follow the rule of mandate of this Court in *Myers One* when he regularly made findings contrary to the findings of this Court?

3.    Did the Honorable District Court Judge Robert T. Benitez erroneously apply *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817 (9th Cir. 2001) and disregard the opinions of plaintiff's experts and treating physicians on the basis that  counsel improperly "poisoned the well"?

4.    Did the Honorable District Court Judge Robert T. Benitez commit reversible error by failing to apply *Haft v. Lone Palm Hotel*, 3 Cal. 3d 756 (1970), which shifts the burden of proof on causation to defendant when its negligence made it impossible for plaintiff to prove causation with any reasonable degree of certainty?

-6-

## STATEMENT OF THE CASE AND FACTS

**A.    Summary Of This Court's Decision In *Myers One***

Since this is the second appeal of this case, much of the factual background is in the Court's prior opinion in *Myers One*.  The first appeal arrived in this Court in 2009 after Judge Benitez's three year delay in issuing his decision following trial of Phase 1.  Phase 1 was supposedly limited to the issue of whether the Defendant was negligent.

In brief, this Federal Tort Claims Act (FTCA) case now dates back nearly 16 years to events that occurred between June and December of 1999.  Lacie, then 3-years-old, lived with her family in the Wire Mountain Family Housing area on the Camp Pendleton Marine Corps Base.  Her complaint alleges that she suffered severe personal injuries from exposure to the toxic heavy metal thallium, and that the exposure was caused by the Navy's negligent failure to ensure that proper safety measures were followed during the dumping of contaminated soils, including soils containing elevated levels of thallium, in a landfill adjacent to Lacie's home.

This Court reversed Judge Benitez's Phase 1 decision finding that there "were numerous errors" in his disposition of the case, due to his conflating foreseeability (negligence) with causation.  *Id.* at 1037.  The district court had "relied, in part, on the determination of a 'causation' issue—whether Myers *was*

-7-

exposed to thallium from the OU-3 project, a question on which Myers had not been fully heard—in what was supposed to be the 'breach of duty' phase of the trial." *Id.* at 1027 (emphasis in original).

During that appeal, Lacie had asked this Court, pursuant to 28 U.S.C. § 2106, to remand the case to a different judge because of the errors it found. The Court declined because "[h]ere, there is no real reason to question the impartiality of the trial judge, notwithstanding what . . . were numerous errors." *Id.* at 1037. While the Court was "troubled by the undue—and unexplained— three-year delay between the conclusion of the first phase of the bench trial and the issuance of an opinion," the court was not convinced "that the trial judge would have substantial difficulty in putting out of his mind his previous findings." *Id.* Accordingly, the Court held that its concerns at that time were not of sufficient "gravity" to warrant reassignment. *Id.* The Court "trust[ed] that [the] proceedings on remand will proceed expeditiously." *Id.* The Court's trust was misplaced as Judge Benitez was unable to put "out of his mind his previous findings."

## B. Judge Benitez's Biased Remarks Post-Reversal

Post-remand, Judge Benitez made little attempt to hide his anger at this Court, its opinion reversing his decision, and at Lacie's counsel for their role in successfully advocating for reversal. This resentment was reflected in his refusal to follow the Mandate of this court, choosing, instead to ignore this Court's

-8-

reversal and reinstate many of his previous overruled findings. Ultimately, his findings demonstrated a one sided, cherry-picking methodology, which misstated and omitted critical facts, to serve his biased narrative. Judge Benitez's anger and frustration at this Court was taken out on Plaintiff's counsel. In the process, Judge Benitez denied Plaintiff a fair hearing, extinguished any appearance of justice, and displayed a clear inability to render a fair judgment. In recognition that recusal is a serious matter and that Lacie's attorneys have an obligation to their client to raise it if they believe recusal is justified, the facts supporting the appearance of bias and prejudice are carefully set out below.[2]

1. **Anger At Ninth Circuit Surfaces At Spread The Mandate Hearing**

    a. **Misstatements As To Case Languishing In Ninth Circuit**

    After petitions for rehearing and rehearing *en banc* were denied by this Court, Judge Benitez's first hearing was on December 5, 2011 to "spread the mandate." At the very outset of that hearing, Judge Benitez criticized this Court for allowing the case to "languish" on its docket:

> THE COURT: All right. Well, let's see, today is the date for spreading the mandate. I guess this case languished at the court of appeals for two years, a notice of appeal having been filed in July of 2009. And they issued an opinion two years later on July 15th, 2011.

---

[2] "Counsel for a party who believes a judge's impartiality is reasonably subject to question has not only a professional duty to [the] client to raise the matter, but an independent responsibility as an officer of the court." *In re Bernard*, 31 F.3d 842, 847 (9th Cir. 1994).

> I had to throw that in as an aside, since my good friend
> and colleague Judge Bennett felt that it was absolutely
> necessary to point out that the case languished here for
> three years.

1 ER0029:13-21.

Judge Benitez was wrong in accusing this Court of letting the case

languish, serving to show that his comments reflect bias rather than an impartial

opinion of the facts. The appeal was docketed on July 15, 2009, and, after several

extensions, briefing was completed by February 3, 2010, oral arguments took place

and the case was submitted on June 10, 2010. The submission was vacated five

days later on June 15, 2010, to permit the parties to consider mediation. Mediation

did not take place. The case was resubmitted and this Court's opinion issued on

the same day, July 15, 2011 (approximately one year after argument and the

subsequently vacated original submission). After petitions by the government for

rehearing and rehearing *en banc* were denied (2 ER0266-267), the Mandate was

issued on October 12, 2011 (2 ER0265).

### b. Misstatements As To Workload

Judge Benitez then suggested his "unexplained" three year delay

noted by this Court was caused by his "thinking" about the case every day during

those three years, and his judicial workload. After his pointed, but erroneous

statement, that the case "languished" in this Court for two years, he explained

"there wasn't a day or a week during that three year period [after the case was

submitted and before his decision] that I didn't think about this case."

1 ER0030:2-3.  Reaching outside the record to compare his docket with District

Judge Bennett, the author of *Myers One*, Judge Benitez then explained that this

Court did not appreciate his heavy workload and the number of cases on his

docket:

> And that lastly, I would point out to my good friend and
> colleague, Judge Bennett, that I have more criminal cases
> on my docket than his entire district.  I have more civil
> cases on my docket than in his entire district.

1 ER0030:14-17.

Again, Judge Benitez was wrong, further showing his bias.  Here are

the facts about workloads and the dockets of <u>all</u> pending cases (civil and criminal)

in Judge Bennett's "entire district" (the Northern District of Iowa) and the per

judge average in Judge Benitez's district (the Southern District of California).

|  | Dec. 31, 2010 | Dec. 31, 2011 | Dec. 31, 2012 | Dec. 31, 2013 | Dec. 31, 2014 |
|---|---|---|---|---|---|
| N.D. Iowa pending cases | 820 | 774 | 723 | 674 | 629 |
| S.D. Cal. (per judge) | 435 | 493 | 474 | 460 | 466 |

All of these statistics are from Table N/A—U.S. District Courts—Combined Civil

and Criminal Federal Court Management Statistics (December 31, 2014) published

by the Administrative Office of the United States Courts of the Judicial Conference

of the United States and available at http://www.uscourts.gov/statistics/table/na/
federal-court-management-statistics/2014/12/31-2, as of May 18, 2015 (Motion for
Judicial Notice, Exh. A, pp. 5-7).  The Administrative Office does not publish
statistics about individual judges.  The statistics for actions per judge in the
Southern District of California, like all of the district court statistics, are averaged
for the number of judges in the district.

Regarding judicial productivity based on number of trials completed
per judge each year in the Northern District of Iowa and Judge Benitez's District,
the Northern District of Iowa is ranked #1 in the country, while the Southern
District of California is ranked #58.  (Motion for Judicial Notice at Exh. A, p. 7.)

As to allowing cases to languish, the Northern District of Iowa has far
less (by over 50%) cases pending over three years than the Southern District of
California.  (Motion for Judicial Notice, Exh. A, p.6)

### c. Judge Benitez's Hostility To This Court's Opinion And Reversal

Judge Benitez was particularly disturbed by this Court's holding that
he committed "clear error" by rejecting the Plaintiff's claim of "breach of duty" for
a perceived "lack of proof of causation as determinative of the foreseeability of
[Plaintiff's] injuries."  *Myers One* at 1035.  Judge Benitez bluntly charged that this
Court, particularly Judge Bennett, failed to read the record or comprehend his

decision.  He also warned counsel that, after the remand, he will "get the last word."

> The Court:  Well, the reason why I mentioned it is because, you know, it's one thing to get reserved or reversed when I'm not taking issue with the question of the discretionary duty issue in this case.  Because that might have been close.  But it's really tough when, you know, you get reversed, and somebody says something like see, <u>Judge Bennett gets the last word because he got to publish the opinion</u>.  <u>But I get the last word</u> because at least I get to get this off my chest.  Somewhere in there, he says something to the effect that I think it's both in a footnote and at page 96.5, when it talks about the fact that I should not have addressed the issue of causation.
>
> Now we went back, and we looked through the record, and there is not once, not once in the record that I ever addressed the issue of her having thallium in her system as a matter of causation.  It was for the purpose of determining foreseeability, which I might add, is, in fact, something that is addressed in a case that he cites, which I believe is the Bigby vs. no, I'm sorry, Scott vs. Chevron case, which talks about the fact that that would be relevant to foreseeability, which is something that you have to consider in connection with the duty.
>
> So again, I don't mind being reversed; that goes with the territory, particularly out here in the Ninth Circuit.  <u>But, at least if I'm going to get reversed, I'm going to get reversed by someone who has actually read the record and understood what it was I was saying when I was ruling on it.</u>

1 ER0031:21-1 ER0032:22 (emphasis added).

Judge Benitez went on to express, gratuitously, his "biased view" about the merits and his rejection of the opinion of this Court.  He stated:

I suppose  I suppose  I suppose that I would have a biased view of that.  But I would just simply say that I would wholeheartedly concur with Judge Rawlinson's position in that case and completely and totally disagree with Judge Bennett and my good friend Judge Kozinski, but whatever.

1 ER0033:21-25.

### 2.  Judge Benitez Summarily Rejects Lacie's Request To Recuse Him

At the conclusion of the first hearing after remand and

Judge Benitez's several statements denigrating this Court and its opinion, Lacie's

counsel suggested that the Judge's strong feelings could negatively affect Lacie

during further proceedings:

> Mr. Cox:  I would be remiss if I didn't mention this.
> The Court:  What is that?
> Mr. Cox:  I understand the court's feeling about Judge Bennett and the finding that he made.
> The Court:  Right.
> Mr. Cox:  And I don't want Lacie Myers to get caught in that cross fire.
> The Court:  It's not.  I think you asked for me to be removed and some other judge to be – that is not going to happen. . .

1 ER0034:8-17.

Any contrary argument about lack of impartiality and bias toward

Lacie and her counsel rings hollow in light of his statements and tone during this

first hearing after reversal.  While Judge Benitez's representations about his

judicial workload, his heavy docket, and his evaluation of the quality of

-14-

Judge Bennett's judicial workmanship are all erroneous and, also, irrelevant to the merits of this case, they are relevant to show his belittling of this Court's opinion and, most importantly, are symptomatic of bias toward Lacie and her counsel and contempt for this Court; they exemplify the "tone of derision that pervades his opinion." *Stuart v. Local 727, Int'l. Bhd. of Teamsters*, 771 F.3d 1014, 1020 (7th Cir. 2014).

### 3. Impartiality And Bias Manifested At The September 24, 2014 Status Conference

On remand, the case was tried over 11 days commencing on February 19, 2013, and submitted on March 8, 2013. No decision was issued for over 18 months after submission. Lacie's request for a status conference to determine the reason for the delay resulted in a Status Conference on September 25, 2014. 2 ER0156-160. As in the first hearing spreading the mandate, Judge Benitez blamed his workload in his district. Again, he explained "about how long it was taking me to decide this case" (1 ER0005:14-15) as follows: "But gentlemen, in the Southern District [of California], we have the fourth highest caseload in the country." 1 ER0006:25-1 ER0007:2. But the facts are otherwise. The case load based on pending cases per judgeship in 2014 placed the Southern District by numerical standing as 46th in the country and 4th in the circuit. Motion for Judicial Notice, Exh. A, p. 7.

### a. Unfounded Denigrating Remarks About the Integrity Of Counsel And The Myers Family

Judge Benitez frequently finds Sgt. Myers, his wife, and Lacie "unreliable" (2 ER0055:17), "not a reliable historian" (2 ER0081:17–18) and "not credible" (2 ER00091:19). He said that counsel had engaged in a "cute little trick" by Sgt. Myers being uniformed in the courtroom (1 ER0018:13-17) while the defendant almost always had uniformed officers in the courtroom. But it borders on meanness for Judge Benitez to insert (erroneously) a non-existent teddy bear and pair of pajamas into a simple photograph of Lacie (3 ER0413). Judge Benitez stated that the "real reason" for the photograph was to play on the Judge's emotions to improperly and erroneously introduce irrelevant urine testing evidence. 1 ER0017:21-1 ER0018:13. The Judge stated: "You wanted to get evidence about the urine content in evidence. You wanted to get it in right way, and there's a real reason why you wanted to do that. And the reason was the first thing you did was you put up a picture of Lacie in her pajamas, and I think she was holding a little teddy bear if I'm not mistaken." 1 ER0017:19-25. That photograph shows Lacie in a shirt, not pajamas and no teddy bear. 3 ER0413.

In justifying his decision, Judge Benitez speculated about what testing "might" have done (2 ER0059:4-2 ER0060:1), or that, if any questions had been raised about faulty monitoring of the site, they "would have been answered" to the Health and Safety Industrial Hygienists' "satisfaction" (2 ER0061:3–4) or that the

NEHL Industrial Hygienist, who "did not actually look at the perimeter air monitoring equipment readings," was credible because it was "obvious" that the Plan was "not just a paper program" (2 ER0062:17–22), and any other "questions" about a flawed inspection by Navy Commander Dan Field "likely would have been satisfactorily addressed" (2 ER0065:23–24). Judge Benitez stated it openly: he "feels" that Lacie was more capable than was reflected in the several medical diagnoses (2 ER0131:5-6).

He was openly derisive to counsel and suggested that counsel lacked integrity. He warned Lacie's counsel not to "B.S. me" (1 ER0006:15), he was concerned that counsel was "making up stuff" (1 ER0008:21-22), that he had "the hardest time getting you [Lacie's counsel] to answer questions for me" (1 ER0009:7-8), so that he would "hammer you [Lacie's counsel]" (1 ER0010:2), that he had a "bone to pick" with counsel (1 ER0011:25-1 ER0012:1) and asserting that counsel was "not true" (1 ER0013:18).

These remarks, taken together, show a virulence not often found in public courtrooms.

### b. The False Accusations That Plaintiff's Counsel Mislead This Court

The barrage of derision directed towards Lacie's counsel reached a high point when Judge Benitez accused counsel of having made misrepresentations about the Judge to the Court of Appeals. 1 ER0017:19, 1 ER0018:20-

-17-

1 ER0019:24; 1 ER0022:22-1 ER0023:21.  Judge Benitez, before the Status

Conference, had arranged to obtain and listen to the audio recording of the oral

argument before this Court (Motion for Judicial Notice, p. 5 C.); he played selected

portions of counsel's appellate argument during the Status Conference; and berated

(erroneously) counsel for allegedly making misrepresentations about the Judge.

Judge Benitez accused plaintiff's counsel of misrepresenting that Judge Benitez

had caused "causation" to come into Phase 1 when it was counsel that had brought

in the issue.

> THE COURT: But don't blame it on me. Don't go to the
> court of appeals and say it was the judge's fault because I
> had nothing to do with it. That's exactly what you wanted
> to do at the very beginning.

1 ER0020:20-23.

      The supposed misrepresentation was in response to a question by the

Court about how causation crept into phase one of the case.  The case was

bifurcated, with the issue of governmental negligence to be tried first.  *Myers v.*

*U.S.,* 652 F.3d at 1027.  The portion of the audio quoted by Judge Benitez was this

(with ellipsis in bold print):

> QUESTION:  [Justice Rawlinson] causation -- in all
> fairness, causation was discussed by both parties during
> the supposed liability phase [of the trial].

> ANSWER:  [By Lacie's counsel] Well, certainly it
> started to creep in when I saw what the judge was doing,

-18-

> but we weren't able to bring our toxicologist.  I wanted to
> bring -- "[". . . **all our medical doctors, our treating
> doctors who have the same . . .**"].

Status Conference Transcript, 1 ER0014:15-20.  Bolded part not played by Judge

Benitez, but was part of the statement by counsel. Appellate Argument Recording

at 26:46. See footnote 5.

> After Judge Benitez made his redacted quote, he stated:

> THE COURT: So that was the comment, the question,
> that I had, Mr. Cox. what was it that I said or did that
> caused causation to creep into the case?

1 ER0014:22-24.

> Counsel then explained to Judge Benitez what he did was to allow

Dr. Shields, the government's fate and transfer of soil expert, who was a causation

expert, to testify in the liability phase, over Plaintiff's objection[3].  That required

Plaintiff to bring her analytical chemistry expert to show she had elevated thallium

in her urine.  Judge Benitez, however, did not allow Lacie to bring her medical

witnesses.  CMC Transcript, 146:5-9. *Myers One* at 1034-35.

> And I said, well, if he's going to say there's not enough
> thallium in the dirt, then we should be permitted to say,
> yes, but there's thallium in her urine, and the only place it
> could have come from is the dirt.

---

[3]  Judge Benitez had overruled Plaintiffs motion to limit the testimony of
Dr. Shields.  2 ER0288-294; 2 ER0285:11-2 ER0286:8.

1 ER0015:5-9.

There was no misrepresentation to the Court of Appeal. The "creep" had to do with Judge Benitez's ruling just before trial allowing Dr. Shields, mainly a causation witness, to testify for the government. This Court then correctly ruled Judge Benitez committed error by conflating causation evidence in his foreseeability analysis. *Myers One* at 1034-35.

The fact that Judge Benitez questioned (erroneously) counsel's integrity reflects his bias, choosing to blame counsel for this Court's ruling.[4]  Like Judge Benitez's assertion that Judge Bennett had not read the record, the full

---

[4]  The following leaves little doubt that Judge Benitez erroneously decided that counsel was responsible for this Court's opinion.

> MR. COX:  I don't remember, your honor. Probably did. But I think the way the trial, honestly, the way the trial went, we were trying the issue of causation.

> THE COURT:  Yes, you were. That's exactly right.

> MR. COX:  As well as the government's negligence.

> THE COURT:  But don't blame it on me. Don't go to the court of appeals and say it was the judge's fault because I had nothing to do with it. That's exactly what you wanted to do at the very beginning.  (1 ER0020:15-23)

> *          *          *

> You had to drag me into it. I don't mean to impugn the judge's motivation; isn't that what you said? (1 ER0026:1-2)

record shows that causation crept into Phase I not out of anything that counsel did, but because Judge Benitez allowed Defendant to put on a witness to testify as to causation, over Plaintiff's objection.

### c. Claim Of Impugning Judge Benitez

Judge Benitez's claim (1 ER0025:4-24, 1 ER0026:1-3) that counsel "impugned" him and his motivation before this Court is baseless. The unredacted quote from the oral argument is this:

> I, I, I don't want to impugn his, his intentions, but I felt like we were sandbagged when I saw this order. I couldn't believe that, this was so clear that they [defendant's representatives and employees] had violated their-violated so many provisions of the FFA . . . their [the Government's] people hadn't done the kind of supervision that had to be done. . ."

Audio of the Court of Appeal argument at 27:50.[5]

Thus, Judge Benitez takes part of a statement by counsel, and through his biased lens, turns it into the assertion that Plaintiff's counsel is impugning his intention.

---

[5] The audio of the oral argument can be found at this Court's website at http://www.ca9.uscourts.gov/media/view.php?pk_id=0000005678. *See* Motion for Judicial Notice, p.5 C. A recording can be made available for the Court's convenience.

### d. Judge Benitez's Determination That Counsel Was Without Integrity

Judge Benitez concluded the Status Conference two months before

handing down his decision with this unsupported determination:

> The Court: Well, all right. Well, I just want to tell you I just don't appreciate it. And here is what happens. If I can trust my lawyer, it makes my life so much easier because when a lawyer says something to me and I can take it to the bank, then all I have to do is look at it and say, okay, is this something I can compare to something else. When I have a lawyer I can't trust, it makes my life very, very difficult. So for example, just about everything you said to me this morning, all I'm trying to do is find out enough information to be able to make a decision, and I can't trust a word you say, not a word.

1 ER0024:23-1 ER0025:9.

There can be no doubt that his decision was influenced by his

unfounded bias toward counsel. Judge Benitez's cynical comments about the

integrity of Plaintiff's counsel impugn the untarnished reputation of a veteran trial

lawyer. Lacie's counsel has practiced over 46 years, is admitted before this Court

since 1966, and has been admitted before many other courts as well, including the

United States Supreme Court. He has tried over 100 jury trials, carries a

Martindale rating of AV, is an elected Fellow of the American College of Trial

Lawyers and American Board of Trial Advocates, and is a former member of the

California State Bar Ethics Committee and the Committee on the Administration of

Justice. His record is unblemished. Motion for Judicial Notice, Ex. B.

-22-

**C.     Plaintiff's Counsel Did Not Poison The Well With The Expert Witnesses**

In addition to showing his bias, Judge Benitez's disregard of the treating physicians requires reversal.  The Judge (erroneously) stated that *Plaintiff's counsel* is the reason for rejecting the expert opinions (*see*, *e.g.*, 2 ER0123:6-7; 2 ER0124:10-14 (counsel made an "absurd" and "transparent attempt to circumvent" Federal Rules); 2 ER0126:10-11; 2 ER0133:4-7; 2 ER0136:4-5) and determined that the Plaintiff's evidence is to be given "<u>no weight</u>."  Why?  Because, as unequivocally announced in the title of Part 6, section d (2 ER0136) of his decision, Judge Benitez rejected all of Plaintiff's expert evidence, determined that "Plaintiff's counsel 'Poisons the Well' with Expert Witnesses" (2 ER0136:4-5), and engaged in "obvious manipulation" of the experts' medical opinions (2 ER0055:13-18).

As will be shown in detail below, an impartial review of the facts establishes that Plaintiff's counsel did not poison the well or in any way improperly manipulate experts.  The evidence shows without any doubt that the experts were all treating physicians who had formed and expressed their opinions based on their treatment of plaintiffs before any alleged tampering or poisoning took place.  Providing a witness with publicly available information, reports of others, or lab tests does not constitute poisoning or tampering.

Plaintiff's three key medical witnesses were Doctors Renfroe (Plaintiff's Board Certified treating pediatric neurologist), Eichenfield (Plaintiff's Board Certified treating dermatologist) and Brown (Plaintiff's retained neuropsychology expert from the University of California at San Diego). 2 ER0055:13-14. The judge similarly rejected the medical causation opinion of the treating medical witness, Dr. Ronald Yarborough, Ph.D. (psychologist) and implied that Dr. Michelle Dern, a pediatrician in San Diego was influenced by lawyers. 2 ER0137:5-7, 2 ER0137:27-2 ER0138:2 .

Counsel provided each of the experts other than Dr. Dern, with written medical information about Lacie, including copies of the laboratory test results showing elevated levels of thallium in Lacie's urine, copies of Lacie's medical records from other treating physicians, and copies of published journal articles on thallium toxicology recommended by Lacie's toxicologist. The experts are all either medical doctors or Ph.Ds. who are board certified in their respective disciplines and each has decades of experience in their fields. It is a *non sequitur* to assert that the opinions of these well-qualified, highly experienced and well respected professionals would be "manipulated" by providing them copies of medical records, test results, and published medical articles. This is especially true where the treating physicians had reached their diagnosis regarding the

involvement of thallium independently and before receiving any of the material later provided them.

Judge Benitez rejects Plaintiff's experts on his "poisoning the well'' theory: Plaintiff's counsel told Dr. Eichenfield about prior tests and there was no record of other "misinformation" that may "have been conveyed in order to taint his opinion" (2 ER0127:8-11); ". . . given the surreptitious way that it was obtained, the Court has elected to disregard Dr. Eichenfield's opinion, giving it no weight" (2 ER0142:19-22). "The Court has considered Dr. Renfroe's testimony and concluded that it is not worthy of being given any weight. This Court does not come to this conclusion lightly. First, like Dr. Eichenfield and Dr. Yarborough, Dr. Renfroe's opinions were severely compromised by Plaintiff s counsel" (2 ER0146:25-26). Dr. Renfroe's opinions "were totally corrupted at an early stage of his 'treatment[]' by counsel; Dr. Brown's opinion was given only after Plaintiff's counsel had "poisoned the well sufficiently" (2 ER0133:5-6).[6] Here are the facts about the three experts.

---

[6] Judge Benitez's decision is littered with other instances of his outright rejection of opinions rendered by other experts offered and assertions about Plaintiff's counsel. Here are a few examples: 2 ER0110:4-5 ("Any opinion by Dr. Briggs, that these results were reliable, is given no weight"); 2 ER0120:19-20 ("The opinion [of Plaintiff's toxicologist, Dr. Gustin] is given no weight"); 2 ER0110:5-6 (stating that the March 2000 test result showing that Plaintiff had 10 times normal levels (6.91) of thallium in her urine "is disregarded"); 2 ER0066:19-21 (stating that the court gives "little weight" the opinions of Roman Worobel, Plaintiff's Certified Industrial Hygienist); 2 ER0090:4-10, 2 ER0089:20 (or the opinion of

### 1. Dr. Renfroe's Opinion Was Not "Corrupted"

Judge Benitez determined that Dr. Renfroe's opinions were severely compromised by Plaintiff's counsel because Plaintiff's counsel sent "journal articles" to him on August 30, 2003. 2 ER0142: 21-28. In a *Daubert* challenge made in 2005, before the Phase 1 trial, the government sought to exclude Dr. Renfroe from testifying based in part on the argument that he had been given scientific literature by counsel. In rejecting the government's motion, Magistrate Judge Anthony Battaglia made findings.

Dr. Renfroe was amply qualified as a pediatrician and neurologist, who was well qualified to recognize, diagnose, and treat heavy metal toxicity, including the neurological effects of such toxicity, such as peripheral neuropathy, mood liability, inattentiveness, memory, and recall problems. 3 ER0331:19-26. He further found Dr. Renfroe had addressed each of the potential alternative causes of Lacie's symptoms raised by defendants, such as autoimmune disorder, and ruled them out. *Id.* at 3 ER0332:11-28.

The Magistrate Judge addressed the claim that counsel sending medical articles on thallium to Dr. Renfroe was improper.

The Court does not find this argument to be persuasive. Dr. Renfroe researched the scientific literature prior to

Plaintiff's expert environmental soil chemist Dr. Chorover "are accorded little weight" and were "unpersuasive").

>the receipt of these articles from Plaintiff's counsel as
>well.  Additionally, the Court fails to see how
>Dr. Renfroe's review or reliance of relevant scientific
>literature of thallium toxicity should be questioned
>simply because such literature was provided by
>Plaintiff's counsel.

3 ER0333:25-28.

Judge Benitez approved Magistrate Judge Battaglia's order
(2 ER0295-296) and, even now, recognizes that (as the legal authorities require) an
expert opinion should be based on "peer-reviewed scientific support" and
"sufficient data" (2 ER0044:5-6).  Now, Judge Benitez finds something sinister by
counsel providing the same medical articles to Dr. Renfroe and describes his
opinions as "totally corrupted."  2 ER0147:25.

There is another more obvious problem with Judge Benitez's
"poisoning the well" theory by counsel providing medical literature to Dr. Renfroe
on August 20, 2003. By that time, Dr. Renfroe had seen and examined Lacie four
times over four months.  He saw Lacie on April 17, 2003, then again on May 12,
2003, on June 4, 2003, and August 12, 2003.  At all of these visits Dr. Renfroe
diagnosed Lacie's problems the same:  thallium toxicity with resultant peripheral
neuropathy, headaches, and behavioral problems including mood liability, and
memory recall problems.  He prescribed Neurontin, a medication for her peripheral
neuropathy.  *See* Lacie's medical chart from Dr. Renfroe, 3 ER0408-412 (April 17,

2003 visit record); 3 ER0407 (May 12, 2003 visit record); 3 ER0404 (June 4, 2003 visit record); 3 ER0403 (August 12, 2003 visit record). The supposed "poisoning" of Dr. Renfroe's opinion, by articles provided on August 30, 2003, could not have influenced his stated diagnosis made during the previous four months.

In May of 2003, Lacie is referred by Dr. Renfroe to Dr. Kevin Saunders, a psychiatrist, and MD in Pensacola to treat Lacie for the emotional problems associated with her thallium toxicity and her associated hair loss. Dr. Saunders examines Lacie on August 13, 2003 and diagnoses "Major Depressive Disorder"; "Educational and academic problem" associated with "Thallium Poisoning". Again, there is no evidence that counsel sent any material to Dr. Saunders. The same is true of Lacie's visit to a pediatric neurologist, Col. Stephen Sharp, an Air Force doctor who saw Lacie on September 20, 2001, after the family had moved to Pensacola, Florida. Dr. Sharp's medical observation was, "Her alopecia is certainly typical of thallium exposure. The sensitivity of her fingers and toes is also likely a manifestation of the sensory neuropathy that is common with this process." 3 ER0399, 3 ER0401. There is no evidence Plaintiff's counsel ever met or communicated with Col. Sharp. Yet, Judge Benitez determines that the evidence of causation is "scant and unreliable." 2 ER0154:17.

## 2.     Counsel Did Not "Bias" Dr. Yarborough

Judge Benitez states:  "Plaintiff's counsel's attempts to bias Dr. Yarborough were downright blatant."  2 ER0137:3-4.  This is so, according to Judge Benitez, because of the "poisoned the well" theory by counsel giving Dr. Yarborough documents at a meeting on May 25, 2002.  2 ER0137:15-17.  As a result, according to Judge Benitez, Dr. Yarborough's opinion regarding causation may not be expressed, under the case of *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817 (9th Cir. 2011).  *Goodman* stands for the proposition, in the Ninth Circuit, from 2011 forward, a treating physician may not give opinions unless they were formed during treatment, absent an expert report pursuant to Rule 26(a)(2)(B).  *Goodman*, 644 F.3d at 826.  Of course, the opinions of Dr. Renfroe, Dr. Yarborough, Dr. Eichenfield, and others, were not only formed during the course of treatment, but the documents given to them (lab reports, medical reports, and published articles) were received after they had reached their diagnosis of thallium toxicity.  Thus, their opinions were not impacted by the ruling of *Goodman*.  All of this happened before *Goodman* was decided.

Judge Benitez goes on:

> "Plaintiff's education of Dr. Yarborough had nothing to do with whatever testing Dr. Yarborough did while he was seeing L[acie] in 2002.  This blatant effort to taint Dr. Yarborough's opinion and then his attempt to hold him out as a disinterested treating physician, renders

> Dr. Yarborough's causation opinion unreliable, and
> untrustworthy of any weight."

2 ER0137:26-2 ER0138:2.

Judge Benitez's Order determined the "poisoning [of] the well" of

Dr. Yarborough occurred on May 25, 2002.  2 ER0137:15-23.  The deposition

actually states, the meeting with Plaintiff's counsel took place on May 25, 2004,

two years later.  3 ER0603:1-25.

Before that meeting, Dr. Yarborough had already reached his opinion

about thallium toxicity being the cause of Lacie's problems.  *See*, for example,

3 ER0602, a January 17, 2003 medical record of Dr. Yarborough's, wherein he

states under diagnosis, "294.9, secondary to thallium dichromate exposure, with

accompanying alopecia and Premature growth."  In block 9 of that form,

Dr. Yarborough goes on, "Patient has minimal ability to abstract, and learning is

impaired. Shows organic signs of perseveration . . . due to measurable 1% tile

deficiency in abstracting ability."

Thus, Dr. Yarborough's opinions about causation related to thallium,

and the serious problems Lacie was having as a result, arose during course of his

treatment of Lacie over one year and four months before the supposed "poisoning"

by counsel. As a consequence, the district court improperly and erroneously

-30-

rejected Dr. Yarborough's causation opinion based on his flawed *Goodman* analysis.

### 3. Dr. Michelle Dern's Opinion Was Not "Manipulated By Counsel"

According to Judge Benitez, Dr. Dern met with Lacie on July 9, 2000 in an appointment arranged by Plaintiff's lawyers. 2 ER0123:9-15. The facts are that Lacie met Dr. Dern, a pediatrician at the University of California Medical Center in San Diego, for the first time on April 28, 2000. The July 9 meeting was with her then lawyers, not Lacie's present lawyers. The meeting referenced, erroneously by Judge Benitez, as being on July 9, 2000, was actually on July 19, 2000. Either way, almost three months earlier, at her first appointment, Dr. Dern examines Lacie, takes a history of abdominal pains, and constipation, and diagnoses Lacie: "Alopecia, likely secondary to thallium toxicity." 3 ER0516. There is no evidence of any lawyer poisoning the well in April. Like other experts, Dr. Dern does not fit Judge Benitez's "poisoning the well" theory and is another example of his mindset to justify his earlier decision.

### 4. Counsel Did Not Poison The Opinion Of Dr. Eichenfield

Judge Benitez sweeps aside the opinion of Plaintiff's treating Board Certified dermatologist, Dr. Richard Eichenfield, in favor of the government's paid expert, Dr. Norris. 2 ER0127:20-22. He does so with a variation of the "poison

the well" theme he uses throughout his order. He rules Dr. Eichenfield's opinion is given "no weight." 2 ER0126:9-11.

Dr. Eichenfield is a well-respected pediatric dermatologist at Children's Hospital in San Diego. 2 ER0121:15-17. When Lacie starts losing her hair in early 2000, she is sent by her Navy family practitioner, Lt. Cmd. Lennard, to Dr. Eichenfield at Children's Hospital in San Diego. Dr. Eichenfield first sees Lacie and her mother on March 20, 2000. He examines Lacie and reaches a diagnosis of alopecia areata, with toxin or heavy metal poisoning in the differential. 3 ER0461. Dr. Eichenfield hears from the mother there has been testing done for heavy metals, but, the results are not yet available. *Id.* Dr. Eichenfield then writes a letter to Lt. Cmdr. Lennard, Lacie's primary care physician, at the Navy Hospital on Camp Pendleton, reporting his diagnosis, and states he would like to see the laboratory work that was done. *Id.*

By this time Lt. Cmdr. Lennard has sent Lacie's urine sample through normal Navy channels to Quest Diagnostics. The sample drawn on March 13, 2000, is sent by Quest to the lab they normally use for heavy metal analysis, National Medical Service, in Willow Grove, Pa. 3 ER0467. The analysis is done, and reported out by the lab to be positive for thallium at 6.9 mcg/l. Normal for unexposed adults is 0.7 mcg/l. *Id.* Thus, Lacie's urine level is 10 times higher than a unexposed adult. *Id.* at 2. The result is reported out on March 29, 2000 to

the Navy. *Id.* at 1. In spite of Dr. Eichenfield's request, the lab report is never forwarded to him by the Navy.

Dr. Eichenfield sees Lacie again on April 10, 2000. He still hasn't received the lab report from the Navy, as requested. His diagnosis is similar to his previous one except now he has learned thallium is the heavy metal involved. His April 10, 2000 office note reads, "alopecia-areata vs toxic exposure (?thallium)." 3 ER0460. He still is without the lab result reporting the positive finding in Lacie's urine. Nobody at the Navy has sent it to him. There is a reason.

At this time, the Marine Corp. was planning a public hearing regarding the concerns of Lacie's hair loss. The Commanding Officer of the Navy Hospital, T.K. Burkhard, sends a report to the Commanding General of Camp Pendleton, on April 18, 2000, and incorrectly states, a noted dermatologist (Dr. Eichenfield) had seen the patient, and determined the hair loss was not due to toxic exposure. 3 ER0352-354. When shown this statement at trial, Dr. Eichenfield said the statement is a misrepresentation of his "sense about Lacie, and the cause of her alopecia." 2 ER0258:2-2 ER0259:1.

Dr. Eichenfield's April 10, 2000 office notes indicate Lacie is to return in 4-6 weeks, in the last two weeks of May, 2000. 3 ER0460. Lacie did not show up for that expected appointment. Dr. Eichenfield became aware of the lab result during that April/May 2000 time period. 2 ER0257:16-25; 2 ER0258:1;

2 ER0260:13-16. The lab result confirmed to him thallium was the cause of her alopecia. *Id.*

Judge Benitez ignores this testimony of Dr. Eichenfield as to when he first saw the lab result, because it doesn't fit his "Plaintiff's counsel poisoning the well" scenario. Instead, he concludes Plaintiff's counsel gave him the lab result prior to his deposition in 2004. 2 ER0123:6-7. Obviously the lab results were being circulated during the end of April, first part of May, 2000. Dr. Dern knew of the 6.9 lab result on April 28, 2000, and notes it in her chart. 3 ER0515.

Even if the lab result was given to Dr. Eichenfield before his deposition in 2004 by Plaintiff's counsel, so what? The lab result was reported to the Navy at the time Dr. Eichenfield was treating Lacie in March of 2000. He wanted to get it, to confirm his diagnosis, but the Navy didn't give it to him. The lab result confirms thallium toxicity being the cause of Lacie's hair loss. Furthermore, the district court's reliance on *Goodman* for the proposition that giving a lab result to a treating physician relating to his already expressed diagnosis is misplaced. In any event, *Goodman* is to be viewed prospectively from 2011, and has no retrospective impact to 2004.

Judge Benitez also sees something sinister in Lacie coming to see Dr. Eichenfield and Dr. Renfroe in 2011. His order states neither were listed as expert witnesses. 2 ER0145:9-11. In fact, both were listed as non-retained experts

-34-

by Plaintiff both prior to the 2006 trial, and then again in 2012, 2 ER0313-314; Plaintiff's Disclosures of Expert Witnesses, March 29, 2012. Both of the 2011 visits were as treating doctors. On questioning at trial, Dr. Eichenfield said his 2011 opinions were, like his 2,000 opinions, based on his clinical impressions. 2 ER0255:1-25; 2 ER0256:1-16. No separate reports under Rule 26 were requested or prepared, because none were required. In addition, following the 2011 visits of both doctors, the records of the visits were provided to the government lawyers, and both Dr. Renfroe and Dr. Eichenfield were deposed. Thus, the government lawyers knew what each doctor had to say about their 2011 visits, over a year before the Phase 2 trial.

At trial, Judge Benitez's biased treatment of Plaintiff's witnesses continues. He sustained a government objection to Dr. Eichenfield testifying about his 2011 visit with Lacie. Then, in his order, he criticized Dr. Eichenfield for not answering his questions to the "Court's satisfaction" related to that visit. 2 ER0127:12-23. Judge Benitez, then, criticizes Dr. Eichenfield for not making a rigorous differential diagnosis in reaching his opinion Lacie's alopecia is related to thallium exposure. 2 ER0125:11-12. Yet, Dr. Eichenfield specifically rules out the other suspected causes in a differential for hair loss: thyroid disease associated with alopecia areata; vitiligo (loss of skin pigmentation) associated with hair loss; Addison's disease; anemias. 2 ER0252-254.

Finally, Judge Benitez criticizes Dr. Eichenfield, as well as the other Navy doctors, Dr. Lennard, and Dr. Robinson for not treating Lacie for thallium poisoning by giving Lacie "Prussian Blue" as a chelating agent, since that is the "standard treatment for poisoning." 2 ER0087:25-27. There is no evidence in the record, "Prussian Blue" was the "standard treatment for poisoning" for someone like Lacie in 2000. In fact, as of 1993, Prussian Blue had not been approved for use in the United States. 3 ER0440 "A Review of Thallium Toxicity" Mulkey and Oehme, page 7. There is no evidence in the record it had been approved for use in the United States as of 2000. Apparently, Judge Benitez's invents a "standard treatment for poisoning" to serve his biased narrative.

### 5. Dr. Sandra Brown

Judge Benitez continues his "poison the well" theory when discussing Dr. Sandra Brown, Plaintiff's retained expert on neuropsychiatry. She is a professor in the Department of Psychiatry at the University of California San Diego. 2 ER0229:1-8. "Dr. Brown testified that she was provided a considerable amount of information by Plaintiff's counsel, including a series of articles on thallium poisoning as well as medical records. In other words, after having, "poisoned the well" sufficiently, Plaintiff's counsel asked her to administer tests and evaluate L." 2 ER0133:2-6. Of course, that is exactly what every lawyer who has retained an expert does: provide relevant material, including medical records,

in this case, articles on thallium, school records, etc.  Nevertheless, Judge Benitez finds "poison" in every communication by Lacie's counsel.

Dr. Brown performed neuropsychological testing on Lacie in 2003, and then again in 2012, found significant deficits in memory, executive functioning, and concentration, all of such cognitive and behavioral problems caused by thallium toxicity.  2 ER0129:26-28.  Contrary to Judge Benitez's finding (2 ER0128:3-12), such deficits are known to be caused by thallium toxicity. 3 ER0416, 419, 421, 423-424, 426, 433.

## ARGUMENT

### A.  Judge Benitez Committed Reversible Error By Failing To Recuse Himself Under 28 U.S.C. § 455

The standard of review for failure to recuse is abuse of discretion, *United States v. Sibla*, 624 F.2d 864, 869 (9th Cir. 1980).  Here, Plaintiff requested reassignment to a different judge in this Court on the first appeal, *Myers One* at 1037-38, and strongly suggested bias to be a problem at the District Court after remand.   If this Court determined that no prior request was made and that the issue was raised for the first time on appeal, the standard is "plain error."  *United States v. Holland*, 519 F.3d 909, 911 (9th Cir. 2008).

Under either standard, it is absolutely clear that Judge Benitez should have recused himself.

"[R]ecusal issues must be raised at the earliest possible time after the facts are discovered." *First Interstate Bank of Ariz., N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 988 n.8 (9th Cir. 2000). While no formal motion to disqualify Judge Benitez was made under 28 U.S.C. § 144, there is no doubt that after Judge Benitez first indicated that he harbored resentment and antipathy for this Court's reversal, counsel for plaintiff raised his concerns about whether Judge Benitez could act impartially. 1 ER0034:8-14. The Judge's response left no doubt that any formal request or motion would be a waste of time.[7]

In any event, in this Circuit, it is not necessary that a motion for disqualification be made in the lower court. Disqualification can be raised for the first time on appeal. *Sibla*, 624 F.2d at 868. "Nonetheless, if no motion is made to the judge . . . a party will bear a greater burden on appeal in demonstrating that the judge . . . [erred] in failing to grant recusal under section 455." *See also Noli v. CIR*, 860 F.2d 1521, 1527 (9th Cir. 1988).

Section 455 requires a judge to disqualify himself or herself from (a) "any proceeding in which his impartiality might reasonably be questioned" and (b)(1) "[w]here he has a personal bias or prejudice concerning a party." Section 455(b)(1) is simply a specific example of situations where a judge's

---

[7] "I think you asked for me to be removed and some other judge to be—that is not going to happen." 1 ER0034:15-17.

impartiality might reasonably be questioned. *Sibla*, 624 F.2d at 867. *See also Clemens v. U.S. Dist. Court for Cent. Dist. of Cal.*, 428 F.3d 1175, 1178 (9th Cir. 2005) (quoting *In re Mason*, 916 F.2d 384, 386 (7th Cir. 1990) (Defining a "reasonable person" as someone who is "a 'well-informed, thoughtful observer,' as opposed to a 'hypersensitive or unduly suspicious person.'")). It does not matter whether or not there is a "reality of bias or prejudice" so long as there is an appearance of bias. *Liteky v. United States*, 510 U.S. 540, 548 (1994).

Traditionally, any showing of bias had to come from an extrajudicial source. *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966). The Supreme Court in *Liteky* clarified that an extrajudicial source "is not a necessary condition for 'bias or prejudice' recusal." *Liteky*, 510 U.S. at 554 (emphasis in original). Instead, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings" can be used to show the bias of a judge if "they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555. Here, of course, Judge Benitez's remarks and actions show a "deep-seated favoritism or antagonism that would make fair judgment impossible." *Id*.

Comments directed towards counsel or counsel's ability, skills or strategy are not usually sufficient to establish bias. *In re Marshall*, 721 F.3d 1032, 1043 (9th Cir. 2013) (citing *Liteky*, 510 U.S. at 555). However, as held in *Baldwin*

*Hardware Corp. v. Franksu Enter. Corp.*, 78 F.3d 550 (Fed. Cir. 1996) hostility

and bias directed at counsel can be the basis for recusal or disqualification if it

"results in material and identifiable harm to that party's case." *Baldwin,* 78 F.3d at

557-58 (citing *United States v. Burt*, 765 F.2d 1364, 1368 (9th Cir. 1985)

(requiring that the bias against counsel be "virulent")). This Court has suggested

that comments directed at counsel should result in disqualification if they are

directed to the integrity or good faith of counsel as opposed to counsel's skill. *See*

*United States v. Wilkerson*, 208 F.3d 794, 798 (9th Cir. 2000) ("[C]utting

comments to counsel, particularly those relating to skill rather than good faith or

integrity, will not generally mandate reversal.") (internal quotation marks omitted).

*See also United States v. Berberian*, 851 F.2d 236, 240 (9th Cir. 1988) (noting that

Judge Pfaelzer had immediately recused herself after telling defendant's counsel

that she felt 'that [he] lack[ed] integrity'); *United States v. Kennedy*, 682 F.3d 244,

259-60 (3d Cir. 2012) (reversing the district court for failure of district judge to

follow the mandate, and reassigning the case to another judge based in part

because the judge "undermines the professionalism of" the party's counsel);

*Rosen v. Sugarman*, 357 F.2d 794, 798 (2d Cir. 1966).

   Given these standards, there can be no question that Judge Benitez

exhibited extreme and virulent bias towards this Court, Lacie, and her counsel, and

should have recused himself after the mandate was handed down. That necessity

was confirmed by Judge Benitez announcing that he no longer respected counsel's

integrity.  That is the point where Judge Pfaelzer stepped down in Los Angeles (*see*

*Berberian*, 851 F.2d at 240), and Chief Judge Pratt stepped down in Iowa (*see*

*United States v. Likens*, 487 F. Supp. 2d 1046 (S.D. Iowa 2007.)[8]

## B.  Judge Benitez's Refusal To Follow The Rule Of Mandate Results Is Reversible Error

Under the "rule of mandate" doctrine, the district court was obligated

to abide by the mandate without varying from it or examining it.  *United States v.*

*Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007) (citing *In re Sanford Fork & Tool Co.*,

160 U.S. 247, 255-56 (1895)).  The standard of review is de novo, as those issues

raise questions of law.  *Terran v. Kaplan*, 109 F.3d 1428, 1432-33 (9th Cir. 1997).

After stating he was "somewhat troubled" by the Ninth Circuit's

conclusion about the failure to "review the perimeter air monitoring data."

2 ER0074:12-18.  Judge Benitez went to on to demonstrate his refusal to follow the

mandate.  Here are a few of the more egregious examples:

| Issue Determined By The Mandate | Judge Benitez's Contrary Holdings in Phase 2 Decision |
|---|---|

---

[8]  "I must candidly admit that such knowledge, combined with the mandate from the Court of Appeals, has caused me to develop a bias against the Government and its request for a sentence of imprisonment for Likens. I am unable to fathom the voracious appetite for a sentence of imprisonment in this case, and unwilling to impose one, but realize that failure to do so would likely result in the sentence being vacated once again by the Eighth Circuit Court of Appeals and assigned to a different judge for yet another resentencing."  *Likens*, 487 F. Supp. 2d at 1047.

| Issue Determined By The Mandate | Judge Benitez's Contrary Holdings in Phase 2 Decision |
|---|---|
| "Tests of the soil in all five areas indicated contamination with toxic substances, *but two, known as Sites 1A and 2A, showed elevated levels of thallium*" (emphasis added) (p. 1024). | ". . . the thallium concentrations for sites 1A and 2A were very low. The evidence supports the conclusion" 2 ER0054:19-21. |
| Thallium was among the "primary contributors" to a high "Hazard Index" (HI) for Sites 1A and 2A, indicating a potentially "unacceptable risk" to human health posed by the elevated levels of thallium and other contaminants in soils (p. 1025). | "The phase 1 and phase 2 investigations of all the sites showed that thallium was not a major threat" 2 ER0051:28-2 ER0052:1. |
| "The HASP [Site Health and Safety Plan] included requirements for monitoring ambient air and airborne contaminants, including levels for total dust that should have required work stoppages" (p. 1025). | The HASP "says nothing about measuring total dust and, in fact, by definition excludes any particulates above 10 micrometers in size" 2 ER0068:24-25. |
| "The district court found that the air monitors employed by IT/OHM were appropriate for the task. However, the district court failed to note that the air monitoring device specified did not monitor 'total dust,' but only dust particles smaller than a certain size" (p. 1025). | "The air monitors employed by IT/OHM were appropriate for the task" 2 ER0081:24-25. |
| "Some analyses of Myers' urine in March 2000 indicated concentrations of thallium well in excess of (as much as ten times) those expected in the urine of persons who had not been exposed to thallium" (p. 1026). | "and the 6.91 test result [referring to the March 2000 analyses], itself, is disregarded" 2 ER0110:5-6. The March 2000 test result is a "single, deeply flawed, urine lab test result." 2 ER0055:11. "The GFAAS laboratory test results of L's urine |

-42-

| Issue Determined By The Mandate | Judge Benitez's Contrary Holdings in Phase 2 Decision |
|---|---|
| "Subsequent tests purportedly showed no concentrations of thallium in excess of those expected in a non-exposed person. The raw data for those later tests was destroyed after this litigation commenced, however, so that there is no way to determine the reliability of those tests" (p. 1026). | samples performed by NMS are unreliable." 2 ER0098:23-2 ER099:1<br><br>Referring to the "subsequent" (post-March 2000) testing for which the raw data has been destroyed, Judge Benitez holds, ". . . these results of approximately 0.2 mcg/L reliably and accurately described the thallium level in L's urine. . .2 ER0099:25-27. |
| "The district court found that there were 'occasions' in the course of the project when the air monitoring equipment registered dust levels in excess of the levels that were supposed to require work stoppages (called 'exceedances' by the parties), but did not note that record evidence showed that such exceedances occurred more than 200 times." (p. 1026) | ". . . there were occasions where the action level for airborne dust might have been exceeded." 2 ER0081:25-26.<br><br>"Regrettably, the author of the Ninth Circuit Opinion noted that the trial court had failed to note that there were over 200 exceedances." 2 ER0077:2-3<br><br>"[E]ven if Navy QAO, Nars Ancog, had reviewed every one of the 3,379 perimeter air monitor readings during each of the 99 days of the Box Canyon project, he would not have had occasion to stop the remediation work because of a HASP action level exceedance." 2 ER0082:2-5. |
| Issue Determined By The Mandate | Judge Benitez's Contrary Holdings in Phase 2 Decision |
| 652 F.3d 1024 fn. 2: "There is no question that thallium is highly toxic. According to a World Health Organization report from 1996, cited in | 2 ER0043 :1-2: "[Thallium] is an element that is toxic at higher doses but relatively harmless at a very low dose." |

| Issue Determined By The Mandate | Judge Benitez's Contrary Holdings in Phase 2 Decision |
|---|---|
| the record, ***no study has determined a 'no-observed-effect level' for exposure to thallium.*** World Health Organization, Environmental Health Criteria 182: Thallium 204-05 (1996)." | 2 ER0087 :20-25: "The PRG was designed to be 3,000 times *less* than the "no observable adverse effect level" (also known as NOAEL) derived from animal studies. [¶] In other words, ***through scientific studies on the effect of thallium on animals, an amount of thallium was determined to have no observable adverse effect on animals***." |
| 652 F.3d at 1036: "Violation of the mandatory duty to review the HASP is plainly a breach of the duty to exercise reasonable care to ensure that the contractor took reasonable care to follow required safety precautions."<br><br>Id. at 1037: "violation of the mandatory duty to ensure adherence to the safety plans is plainly a breach of the duty to exercise reasonable care to ensure that the contractor took reasonable care to follow required safety precautions." | 2 ER0093:3-5 "The evidence does not convince the Court that Defendant was negligent in its task of ensuring IT/OHM [contractor] performed the Box Canyon work with adequate safety measures in place." |

As the table above demonstrates, Judge Benitez's Phase 2 decision makes findings on key issues that are the exact opposite of those reached by this Court in its opinion following the Phase 1 appeal.

The judge's contravention of the mandate cannot be characterized as "harmless error"; indeed, his contrary findings were highly prejudicial to Plaintiff's

ability to prove her case in Phase 2. For example, by rejecting this Court's determination that the soils at Sites 1A and 2A contained elevated levels of thallium and substituting his own judgment that the thallium levels at those sites was "very low," Judge Benitez made it virtually impossible for Plaintiff to prove that her injuries were caused by exposure to the thallium in those soils (how could Plaintiff possibly hope to show that she was harmed by soils that did not contain potentially harmful levels of thallium?). Similarly, by rejecting this Court's determination that the analyses of Plaintiff's urine in March 2000 showed elevated levels of thallium as much as 10 times those of unexposed individuals, Judge Benitez deprived the Plaintiff of perhaps the most compelling evidence that she was, in fact, exposed to dangerous levels of thallium and that such exposure was the cause of her injuries. In addition, by rejecting this Court's finding there is not a NOEL (No-observed-effect-level) for thallium, Judge Benitez then concludes there is a NOAEL for thallium. This, in turn, led him to conclude thallium to be relatively harmless in very low doses, when there is no scientific basis for such a conclusion. In short, Judge Benitez contradicts the mandate on issues that were foundational to the Plaintiff's claims that she was harmed by exposure to thallium as the result of the Navy's negligence.

**C.** **It Was Reversible Error To Deny Plaintiff's Motion To Shift The Burden Of Proof**

Plaintiff in her Memorandum of Contentions of Fact and Law/Pretrial Disclosures argued that because of the Government's negligence regarding test data, the burden of proof must shift to Defendant to prove its negligence was not the proximate cause of Lacie's injuries. 2 ER0308:12-2 ER0312:2. Judge Benitez denied Plaintiff's request to shift the burden of proof. 2 ER0056:4-2 ER0057:17. This is further evidence of his bias and impartiality, because his rejection has no basis under the facts of this case. Moreover, the decision not to shift the burden of proof on causation to the Government constituted reversible error in and of itself. The standard of review is de novo, as those issues raise questions of law. *Terran*, 109 F.3d at 1432-33.

The leading California case is *Haft v. Lone Palm Hotel*, 3 Cal. 3d 756 (1970). There two people drowned in a hotel swimming pool which had no life guard, as required by state statute. As a result, there were no witnesses to the drowning. The court shifted the burden of proof on causation when plaintiffs were able to show that a competent life guard, and proper safety warnings, would have likely prevented the deaths. The court reasoned that requiring the plaintiff to establish proximate cause to a greater certainty would permit the defendant to profit in a situation where the defendant's negligence caused the lack of proof of

what occurred.  *See also Summers v Tice*, 33 Cal. 2d 80 (1948); *Ybarra v Spangard*, 25 Cal. 2d 486 (1944).

In this case, like *Haft*, the absence of definitive evidence on causation is a direct and foreseeable result of defendants' negligence.  In *Haft*, it was foreseeable, without a lifeguard, someone could drown, and there would be no evidence of the cause of the drowning.  Accordingly, the burden of proof was switched to the defendant to prove the lack of a lifeguard was not causative.  Here, a foreseeable result of defendant's negligence is that someone in the Wire Mountain housing area could be injured by contaminated dust blowing off the landfill; and further, the uncertainty as to how much contaminated dust, and which contaminants were involved, is the direct result of the Government's negligence.  The uncertainty as to causation in Lacie's case is a result of an improperly managed and supervised air monitoring system.  Had the Government not been negligent in failing to have a CIH review the HASP, a proper air monitoring system would have been in place, just like the one the Government used in 1997 and 2001, measuring total dust.   The same is true as to the failure of Nars Ancog, the Navy's Quality Assurance Officer, to review the monitoring data to see exceedances were occurring, and that IT/OHM was not measuring for total dust as called for in the HASP.  Both of these negligent conducts led to inadequate measurements of the amount and type of dust migrating off the land fill, resulting

in everyone's inability to know how much dust was being blown off the landfill, and how much thallium was contained in that dust.

This California law about proof of causation has been uniformly applied by California courts in many settings where the defendant was in control of the instrumentality of injury, or whose acts caused the uncertainty. *See Ybarra*, *supra*; *Summers*; *Harris v. Irish Truck Lines, Inc.*, 11 Cal. 3d 373, 378 (1974).

The same law about burden shifting applies to a clearly negligent party. When a negligent party and an innocent cause combined to create an indivisible injury, the burden of proof of causation is shifted to the wrongdoer. *Fiberboard Paper Products Corp. v. E. Bay Union of Machinists,* 227 Cal. App. 2d 675, 704-05 (1964). If the defendant cannot meet the burden, the defendant is liable for all the damage. The same applies in other factual settings involving indivisible injuries. Multiple negligent auto drivers who successively collide with plaintiff, and plaintiff's injury is not susceptible to apportionment, shifts the burden on causation to the drivers to prove they did not cause plaintiff's injuries. *Cummings v. Kendall*, 41 Cal. App. 2d 549, 558-59 (1940).

Application of these authorities operates to shift the burden of proof to the Government to prove either: (1) Lacie has not suffered an injury due to being exposed to thallium, or, (2) her exposure to thallium comes from a source, other than the landfill. If Lacie has suffered from exposure to thallium, the only known

-48-

source is the landfill. She is the foreseeable plaintiff, suffering from the foreseeable injury. The only missing link to create certainty is specific evidence of thallium leaving the landfill and migrating to Lacie. The lack of proper air monitoring resulting from the Government's negligence has made it impossible for Lacie to prove causation with that certainty. Under the California law, the Government must prove they did not allow thallium to migrate off site. The only way to prove that one way or the other is to have proper air monitoring data of both respirable dust (PM-10), and total dust as well as a speciation of that dust. The Government negligently failed to provide either.

*Haft v. Lone Palm Hotel* states settled law and has been followed in several federal jurisdictions involving FTCA claims based on the failure of the government to properly supervise its contractor, or to properly monitor dangerous contaminants, or radioactive fallout. *See, e.g., Dickerson, Inc. v. Holloway*, 685 F. Supp. 1555, 1569 (S.D. Fla. 1987); *Allen v. United States*, 588 F. Supp. 247, 411-413 (D. Utah 1984), *rev'd on other grounds*, 816 F.2d 1417 (10th Cir. 1987).

Judge Benitez incorrectly determined that burden shifting was improper under *Haft* because Lacie's injuries were uncertain nor could it be said with certainty that the injuries were caused by Box Canyon thallium dust. 2 ER0056:26-2 ER0057:17. Of course, this misses the whole point of *Haft* since it ignores the fact that any uncertainty was caused by the Government's negligence.

-49-

*Sanderson v. International Flavors and Fragrances, Inc.*, 950 F. Supp. 981 (C.D. Cal. 1996), relied upon by Judge Benitez, is inapplicable and does not even cite *Haft.* That case involved application of the doctrine of "alternative liability," which permits burden shifting to multiple defendants where a plaintiff can prove injury was caused by one of them, but where plaintiff is not sure which one. Here, there is no doubt that Lacie has suffered injury. *Haft* applies to the situation here, where the negligence of a party is the cause of the plaintiff being able to prove causation with certainty. *See Galanek v. Wismar*, 68 Cal. App. 4th 1417, 1426 (1999) (burden shifted to attorney in legal malpractice case to prove that his negligence in allowing destruction of key evidence did not cause client to lose case).

Although Judge Benitez off-handedly stated that even if the Government had the burden of proof on causation, it met it (2 ER0056:22-25), it is clear under this Court's ruling, the Government, did not properly monitor total dust coming off the landfill. In the end, this Court should find Lacie's injuries were proximately caused by the Government's negligence, and remand the case limited to the issue of damages.

**D.     This Court Should Determine The Issue Of Causation And Remand The Case To A New Judge To Decide Damages On The Basis Of The Record And Further Briefing**

**1.     This Court Can Make Findings That The Government's Negligence Proximately Caused Lacie's Injuries**

Because of Judge Benitez's error in failing to shift the burden of proof to the Government on the issue of causation, this Court can find on the present record that the Government has failed to prove that its negligence was not the cause of Lacie's injuries.  In the alternative, it can find on this record, much in the same way that it determined that the Government was negligent in *Myers One*, that the Government's negligence proximately caused Lacie's injuries.  Viewed without the constraints of Judge Benitez's improper ruling dealing with "poisoning the well," the medical evidence clearly indicates Lacie was suffering from the classical symptoms of thallium toxicity: alopecia, gastric problems, peripheral neuropathy, and cognitive dysfunction.

**a.     Gastrointestinal Symptom**

Both of Lacie's parents testified that Lacie suffered gastrointestinal problems early in the course of her illness, and that they took her for treatment with Dr. William Lennard, a Navy physician from the Naval Hospital at Camp Pendleton.  Judge Benitez dismisses the parents' testimony as unreliable, stating, "The medical records however do not support such a claim."  2 ER0138.  Judge Benitez fails to note the evidence in the record making clear that, for some

unknown reason, the Navy failed to preserve a complete copy of Lacie's medical records. In particular, the evidence is clear that Lacie was treated at the Naval Hospital on Camp Pendleton in December of 1999, but that the records regarding her treatment from that time period were not preserved. Dr. Lennard testified that he remembers seeing Lacie "before Christmas sometime in late '99." 2 ER0166 (citing Docket Entry 525 at 12:21-13:4). Dr. Lennard's memory regarding his treatment of Lacie in December of 1999 is corroborated by the fact that his treatment notes from March of 2000 (the earliest record preserved by the Naval Hospital) states that he was seeing Lacie at that time "for follow-up." 2 ER0166 (citing Docket Entry 525 at 13:16-24).

### b. Peripheral Neuropathy

Lacie suffered from peripheral neuropathy, a symptom commonly seen in cases of thallium poisoning. 2 ER0221:14-2 ER0222 (Testimony of Dr. Barry Gustin). Christine Myers testified Lacie complained of heat sensitivity in her hands and feet from the time her hair was falling out in 1999, and she was suffering with gastro intestinal distress. 2 ER0263:9-19. Dr. Stephen Sharp, an Air Force Col. and pediatric neurologist in Pensacola, observed that the sensitivity in Lacie's hands and feet were consistent with a sensory neuropathy that is common with thallium toxicity. 3 ER0399. Dr. Ben Renfroe, Lacie's treating pediatric neurologist, also testified Lacie had peripheral neuropathy by history and

examination, which, along with her other symptoms of alopecia and encephalopathy, are caused by thallium toxicity. He could see no other explanation for this constellation of abnormalities in Lacie. 2 ER0248:8-2 ER0249:3. Numerous other treating doctors observed peripheral neuropathy and the other described symptoms and connected them to Lacie's exposure to thallium. *See* 3 ER0479-600, a summary chart with referenced medical records as exhibits.[9]

The government offered only Dr. Snead, their paid neurologist to counter the findings of these doctors of peripheral neuropathy. However, Dr. Snead didn't see Lacie until August 14, 2004 when he first examined her. 2 ER0209:14-19. Prior to that time, Dr. Sharp (September of 2001) and Dr. Renfroe (April 2003), both pediatric neurologists, found Lacie suffered from peripheral neuropathy.

### c. Lacie Had Elevated LDH Levels In Her Blood

Lacie's hair loss is undeniable. The issue at the trial was whether that hair loss was due to toxic exposure, or alopecia aerate, an autoimmune disorder. Dr. Eichenfield stated it was due to exposure to thallium, while Dr. Norris, the

---

[9] The records of twelve treating doctors are compiled in Exhibit 862 (3 ER0479-600), used by Plaintiff's counsel in argument and provided to the court, at its request, following argument. Exhibit 862 contains attachments of the relevant medical records of the twelve of Lacie's treating doctors. 2 ER0205:6-8, 2 ER0161-203.

government's retained dermatologist opined it was alopecia areata. The objective evidence supports toxic exposure as the cause.

In March of 2000, the Navy's laboratory at the NHCP tested Lacie's blood for lactate dehydrogenase (LDH), and the NHCP's laboratory flagged the results as "high" (above the normal range). 3 ER0383. This objective laboratory finding supports the conclusion that Lacie's symptoms were caused by toxic exposure to thallium.

      **d.**    **The Published Literature And The Parties' Experts Agree That Increased LDH Levels Are An Indicator Of Thallium Toxicity**

A 1988 study of rats exposed to low levels of thallium over a 90-day period showed increases in LDH levels in treated animals. 3 ER0445. The EPA later observed the authors of the study (Stoltz, *et al*.) noted that, after the first 30 days of exposure to thallium, both male and female rats had "moderately increased" LDH levels in a "dose-related pattern." 3 ER0445. After the full 90 days of exposure, male rats showed increased LDH levels "in all groups receiving thallium, and female rats in the 0.25 mg/kg exposure group also showed increased LDH levels. *Id*. Notably, the 90 day rat study discussed here involved the lowest doses of thallium ever tested. 3 ER0433, 3 ER0455. In addition to increases in LDH levels, alopecia (hair loss) was observed in the rats exposed to these very low levels of thallium, leading the WHO to conclude that even the very lowest dose

ever studied (0.01 mg/kg) is associated with adverse effects. 3 ER0433, 3 ER0455.

Moreover, humans are considered to be "more sensitive than laboratory rodents to

the toxic effects of thallium." 3 ER0433, 3 ER0455.

Likewise, the World Health Organization noted that the study showed

"[s]mall but statistically significant changes in some clinical chemistry parameters"

(clearly referring to LDH, although LDH is not mentioned explicitly) at even the

lowest dose level. 3 ER0433, sections 10.1.4 and 10.1.5, 3 ER0455.

Indeed, during a rare moment of candor, in response to a question

from the Court, the Defendant's own expert, Dr. Norris, admitted that elevated

LDH levels are an indicator of cell damage from toxic exposure:

> THE COURT: Before you start, Mr. Cox, I have a
> question.
>
> There was mention of LDH. I think I got that right.
>
> THE WITNESS: Lactate dehydrogenase.
>
> THE COURT: Is there any relationship between LDH
> and alopecia areata and/or thallium toxicity to your
> experience that you know of?
>
> THE WITNESS: Well, LDH is a marker of cell damage.
> So it's used in the laboratory, but you can actually use it
> as a measure of toxicity. You put some kind of a toxin on
> cells, and they release LDH. You can measure that. And
> in the case of – in the human body, if you look at serum,
> and you look at LDH, that can be seen in people who
> have toxic reactions or damage to an organ. And
> commonly, it is something you see in liver damage.
>
> THE COURT: Heart attacks?

-55-

THE WITNESS: Heart attacks, another place you see when you have – when you have – the cardiac cells are damaged, they release LDH. And it is not well linked to hair loss clinically. In other words, we don't have studies that follow LDH release and different kinds of hair loss. So there is no scientific basis in any kind of clinical-related studies to show that it's linked to any kinds of hair loss we're discussing in this case.

2 ER0215:22-2 ER0216:20.

### 2. There Is No Association Between Elevated LDH And Autoimmune Alopecia

The Government contends that Lacie has alopecia from an autoimmune cause. In contrast to the clear link between elevated LDH and thallium toxicity, there is no association between high LDH levels and alopecia caused by autoimmunity.

According to Dr. Norris:

Q. Do we have data or do we not have data that LDH is released by alopecia areata caused by an autoimmune process?

A. I think that there is no data in the literature that examines that fact.

2 ER0217:23-2 ER0218:1.

Moreover, a published study that specifically looked for a link between elevated LDH levels and alopecia found none: None of the patients examined showed abnormal total serum-LDH. . . . In our opinion this indicates

-56-

that there is no relationship between serum-LDH and the forms of hair loss examined.  3 ER0478, Section B.

Thus, the scientific, objective, evidence of elevated levels of LDH in Lacie's blood indicate her alopecia is not caused by an autoimmune reaction, but rather by a toxic insult, such as thallium exposure. This scientific evidence supports the diagnoses of Lacie's treating physicians her problems are related to thallium exposure.  This Court should make a finding that is the case.

Lacie has had to undergo two trials based on errors committed by Judge Benitez.  She simply cannot afford to go through a third trial, which would involve the exorbitant costs of experts, whose testimony has already been taken, which she no longer can afford.

**3.     This Court Should Remand The Case To A New District Court Judge To Determine Causation, If It Does Not Do So, And To Make A Determination Of Lacie's Damages Based On The Extensive Record**

At this point, both parties have fully presented their evidence on the issues of causation and damages (the issues tried during Phase 2).  The only thing lacking is a fair and impartial ruling based on the evidence, which Judge Benitez failed to provide because of his bias and decision to disregard this Court's mandate.  The Plaintiff therefore respectfully submits that the appropriate course is to remand the case, with specific instructions to assign a new judge to decide the case fairly and impartially on the record (and according to the correct burden of

-57-

proof). The parties can assist the newly-assigned judge with briefs and through oral arguments, as requested.

With respect to the identity of the new judge, the Court should take note that Judge Battaglia, who is now an Article III judge in the Southern District, has great familiarity with this case based on his prior involvement as a Magistrate making a report and recommendation on *Daubert* challenges filed by the Defendant against virtually all of the Plaintiff's experts. Plaintiff therefore submits that it would be appropriate to remand the case with instructions to assign Judge Battaglia to render a decision based on the evidence in the record.

This Court should remand the case to the District Court for the limited purpose of determining damages. If it does not determine causation, it should remand to the District Court to determine causation as well as damages on the record adduced at the two trials in this case. Federal appellate courts have done so, where, as here, it would consume valuable time and resources to conduct further hearings. *See McCord v. Bailey*, 636 F.2d 606, 613 (D.C. Cir. 1980) ("Although inadequate findings and conclusions may be remanded to the district court for supplementation, 'we will not remand a case for more specific findings if doing so will consume precious time and judicial resources without serving any purpose.'") (quoting *LaSalle Extension University v. FTC*, 627 F.2d 481, 485 (D.C. Cir. 1980)). *See also Milton v. Weinberger*, 645 F.2d 1070, 1079 (D.C. Cir. 1981)

(remanding, in a discrimination case, "to the District Court to determine whether there is *on the existing record* a legitimate non-discriminatory reason for not promoting the appellants" (*emphasis added*)); *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 502 F.App'x 81, 82 (2d Cir. 2012) ("Jurisdiction is restored to the district court for the limited purpose of deciding, *solely on the basis of the existing trial record* and without reliance on the two findings we have set aside, whether Defendants acted with reckless disregard for the truth" (*emphasis added*)).  This Court in *In re Mendoza*, 182 F.App'x 661, 663-664 (9th Cir. 2006) remanded "with direction that the bankruptcy court determine *on the basis of the existing record* whether Mendoza has made a good faith effort to repay his student loans." *Id.* (*emphasis added*).

The parties have called all their witnesses.  A new judge has ample evidence in the record to make his or her determination.  To require Lacie to again undergo the expense of a trial on damages or causation would be a denial of justice.

## CONCLUSION

Judge Benitez's decision, like the hearings leading up to it, materially prejudiced Lacie Meyers and demonstrated that he could not put out of his mind his previously expressed findings.

Under all the circumstances and unusual facts in this case,
Judge Benitez should have recused himself. Accepted practice dictates that result.
*See Liteky* at 548; *United States v. Gardenhire*, 784 F.3d 1277, 1283-84 (9th Cir.
2015); *Myers One* at 1037.

Based on Judge Benitez's record, it is clear that he has not and cannot
be expected to follow this court's rulings. Four and one half years of unexplained
delays (or erroneously explained delays) coupled with two years because of a
necessary appeal required by Judge Benitez's "numerous errors," and, now, a
decision by the Judge, after pervasive denigrating, deprecating, and blatantly
erroneous comments, should not give Judge Benitez the "last words." Those many
years have denied Lacie a full and fair hearing.

Nor should Lacie be further punished by having to go through a third
trial. This Court can and should, as it did before, make findings to correct the clear
errors made by Judge Benitez. It is not necessary to retry the issue of causation
when this Court can made that determination on the record before it that Lacie's
exposure to thallium was proximately caused by the Government's negligence.

Reversal and reassignment for a brief trial on damages is essential to
maintain the appearance of justice. Judge Benitez's judgment should be reversed
because of his pervasive bias and absence of impartiality. The appearance of
justice can only be served under 28 U.S.C. § 2106 by remanding this case to a

-60-

different judge for a fair and expeditious trial based on the record already produced.

Contrary to Judge Benitez's acerbic and contemptuous characterization of Plaintiff's counsel, Lacie, and denigration of this Court's opinion, the only "poisoning" present in this case was Lacie being "poisoned by the escaped thallium." 2 ER0155:5-8.

Dated**:** June 12, 2015

**BARTKO, ZANKEL, BUNZEL & MILLER**
  Stephen T. Cox

**LAW OFFICES OF SCOTT J. ALLEN**
  Scott J. Allen

By:  */s/ Stephen T. Cox*
_____
    Stephen T. Cox

Attorneys for Plaintiff/Appellant
CHRISTINE MYERS, as Guardian Ad
Litem for L. M., a minor, individually

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, there are no known related cases pending in this Court.

Dated**:** June 12, 2015

**BARTKO, ZANKEL, BUNZEL & MILLER**
  Stephen T. Cox

**LAW OFFICES OF SCOTT J. ALLEN**
  Scott J. Allen

By: *  /s/ Stephen T. Cox*
_____
    Stephen T. Cox

Attorneys for Plaintiff/Appellant CHRISTINE MYERS, as Guardian Ad Litem for L. M., a minor, individually

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)

1.     This brief complies with the type-volume limitation of Fed. R. App.

P. 32(a)(7)(B)(i) because this brief contains 13,867 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

2010 in 14-point, Times New Roman font.


Dated**:** June 12, 2015

**BARTKO, ZANKEL, BUNZEL & MILLER**
  Stephen T. Cox

**LAW OFFICES OF SCOTT J. ALLEN**
  Scott J. Allen

By:     */s/ Stephen T. Cox*

  Stephen T. Cox

Attorneys for Plaintiff/Appellant
CHRISTINE MYERS, as Guardian Ad
Litem for L. M., a minor, individually

| 9th Circuit Case Number(s) | No. 14-56895 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) 6/12/2015 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)   /s/ Stephen T. Cox

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)                .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)